**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**

**REGINALD L. GRIDER** **PLAINTIFF**

**v.** **CIVIL ACTION NO. 5:25-CV-00011-JHM**

**KIMBERLY ANDERSON, *et al.*** **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the motion by Defendants Kimberly Anderson, Shane Spurlock, and Delvin Nielsen for summary judgment pursuant to Federal Rule of Civil Procedure 56. (DN 41). Plaintiff Reginald L. Grider filed a response. (DN 51). Defendants did not file a reply. Accordingly, this matter is fully briefed and stands ripe for decision.

**I.**

At all times relevant to the adjudication of this motion, Plaintiff was incarcerated as a convicted prisoner at the Kentucky State Penitentiary ("KSP"). (DN 9, PageID #: 34). Plaintiff filed the instant *pro se* action under 42 U.S.C. § 1983 alleging violations of his constitutional rights during his incarceration at KSP. (DN 1). The Court conducted an initial review of the complaint pursuant to 28 U.S.C. § 1915A and allowed an Eighth Amendment excessive force claim to proceed against Defendants in their individual capacity. (DN 9). Defendants deny the claims against them and now move for summary judgment on Plaintiff's Eighth Amendment excessive force claim.

**II.**

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-movant must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of *pro se* pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 U.S. App. LEXIS 27051, at *6-7 (6th Cir. May 5, 2010) (citations omitted). When opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and a party's "status as a *pro se* litigant does not alter" its burden of showing a genuine issue for trial. *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted). Yet statements in a verified complaint that are based

on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

## III.

### A. Plaintiff's Allegations

Plaintiff alleges that, during a November 22, 2023, psychiatric follow-up for his anxiety disorder, he reported difficulty sleeping, flashbacks, and concerns about his safety and lack of protection by prison administration. (DN 1, PageID #: 5). Plaintiff states that he was already prescribed Prozac, that Topamax was added, and that he was not informed of possible medication side effects or what to do if he experienced them. (*Id.*). Plaintiff alleges that, on January 18, 2024, after requesting mental-health assistance during morning pill call, he stopped Officer Robert Holmes during a thirty-minute round and requested to consult mental-health staff. (*Id.*). Plaintiff states that Holmes notified Defendant Anderson, who removed Plaintiff from his assigned cell at approximately 1:20 p.m. and took him to the Seven Cellhouse strip cage, where Holmes strip searched him. (*Id.*). Plaintiff maintains that Defendant Anderson falsely reported that he expressed suicidal thoughts and placed him on constant watch. (*Id.*).

Plaintiff alleges that he protested constant watch and continued requesting to speak with mental-health staff and Defendant Anderson's superior. (*Id.*, PageID #: 5–6). Plaintiff states that, when his requests were ignored, he became frustrated and began striking the cell window with his hand. (*Id.*, PageID #: 6). Plaintiff alleges that Defendant Anderson threatened to use force if he did not stop and, when he continued, ordered him to surrender his suicide smock as punishment and retaliation. (*Id.*). Plaintiff contends that he was permitted to possess the smock while on suicide watch and that a team should not have been assembled to remove it. (*Id.*).

Plaintiff alleges that Defendant Spurlock spoke with him as the incident escalated and promised to intervene by notifying the unit supervisor, but failed to do so. (*Id.*). Plaintiff states that, after speaking with Defendant Anderson, Defendant Spurlock returned, ordered Plaintiff to surrender his smock, and stated that officers would enter and take it when Plaintiff refused. (*Id.*, PageID #: 6–7). Plaintiff alleges that Defendant Anderson led the entry team and that vapor spray was immediately deployed after he refused an order to surrender the smock. (*Id.*, PageID #: 7). Plaintiff maintains that officers failed to employ reasonable measures because they did not first order him to submit to mechanical wrist and leg restraints so the smock could be removed. (*Id.*).

Plaintiff alleges that, after the spray was deployed, he submitted to mechanical restraints without resistance or assaultive behavior. (*Id.*). Plaintiff states that Defendant Nielsen held his arm and escorted him to the strip area, where officers removed his smock before he entered the strip cage. (*Id.*). Plaintiff alleges that Defendant Nielsen then entered the cage while still holding his arm and forcefully attempted to drive him into the back wall, requiring him to move his head to avoid striking his face against it. (*Id.*, PageID #: 7–8). Plaintiff further maintains that Defendants and other team members entered the cage and assaulted him while he was on the ground in mechanical restraints. (*Id.*, PageID #: 8). Plaintiff maintains that Defendant Spurlock tased him at least twice while others kicked him and struck him with closed fists until he became unconscious. (*Id.*).

Plaintiff alleges that officers then escorted him to a restraint chair and that, fearing for his life, he refused to cooperate with being placed in the chair. (*Id.*). Plaintiff maintains that Defendants Anderson, Spurlock, and Nielsen repeatedly tased him with at least three different tasers at once. (*Id.*).

**B. Defendants' Motion for Summary Judgment**

Defendants seek judgment on the grounds that Plaintiff failed to exhaust administrative remedies, the evidence does not establish excessive force, and qualified immunity protects their conduct. (DN 41-1, PageID #: 158–170).

Defendants argue that Corrections Policy and Procedure ("CPP") 14.6 required Plaintiff to submit a grievance within five working days of the incident and identify all aspects of the issue and all involved individuals. (*Id.*, PageID #: 159). Defendants state that Plaintiff filed his only two related grievances on February 19, 2024: one alleging that Defendant Nielsen attempted to drive his face into a wall and that officers struck him until he became unconscious, and another challenging deployment of OC spray without a request that he submit to restraints. (*Id.*). Defendants acknowledge that both grievances were rejected as addressing a non-grievable Adjustment Committee decision in disciplinary proceeding KSP-2024-0000099. (*Id.*). The grievance rejection notices state, "The issue you are grieving is non-grievable because it is a/an . . . Adjustment Committee decision," and reference disciplinary report KSP-2024-0000099. (DN 41-2, PageID #: 172; DN 41-3, PageID #: 176). Both notices leave the separate ground, "Grievance filed more than five (5) working days after the incident," unmarked. (*Id.*). Defendants nevertheless contend that both grievances were untimely and that the second failed to include all allegations or identify any staff members, establishing a failure to comply with the procedural requirements for exhaustion. (DN 41-1, PageID #: 159–160).

On the merits, Defendants maintain that Plaintiff actively resisted officers, kicked at staff, bit Nielsen, and attempted to seize a taser, creating an immediate threat that justified force to regain

control. (*Id.*, PageID #: 160). Defendants contend that Plaintiff's objection to removal of his suicide smock does not establish excessive force and concerns due-process claims already dismissed at screening. (*Id.*). Defendants further assert that surveillance footage shows Plaintiff placing and leaving his hands underneath the smock, and handheld footage shows him refusing orders to back up to the cell door for restraints. (*Id.*). In her attached discovery responses, Defendant Anderson states, "Inmates' hands must be in view at all times while on watch to ensure that they are not attempting to harm themselves," and asserts that Plaintiff repeatedly concealed his hands beneath the smock. (DN 41-22, PageID #: 278). Defendant Spurlock similarly explains that officers needed "a constant view of the inmate's hands" to ensure he was not harming or attempting to harm himself beneath the smock. (DN 41-23, PageID #: 293).

Defendants state that Plaintiff refused orders to remove his hands from beneath the smock, surrender it, and back up to the door, prompting activation of the entry team and a short burst of OC spray. (DN 41-1, PageID #: 161; DN 44-1, PageID #: 316). Defendants assert that, after Plaintiff complied and was restrained, officers escorted him to the strip cage for a strip search and to allow his observation cell to air out. (*Id.*). Defendants maintain that Plaintiff then pulled away, attempted to kick officers, and grabbed Defendant Spurlock's taser, causing Defendant Spurlock to deploy two dart packs, only one of which made contact. (*Id.*). Defendants state that officers obtained authorization to use a restraint chair and that Plaintiff resisted placement by kicking, headbutting, pushing staff, and biting Defendant Nielsen's arm hard enough to break the skin and draw blood. (*Id.*, PageID #: 161–162, 317). Defendants maintain that Defendant Spurlock used a drive stun to release Plaintiff's bite, officers placed Plaintiff on the ground under a capture shield, and Anderson later applied a spit mask. (DN 41-1, PageID #: 162). Defendants assert that Plaintiff continued resisting, grabbed Recreation Leader Horne's arm, attempted to seize his taser, and

required repeated drive stuns before officers secured him in the chair. (*Id.*). Horne's attached disciplinary report states, "Inmate Grider resisted and attempted to grab my Taser 7 while placing him in the restraint chair," and attributes the drive stun to Plaintiff "resisting and assaulting staff." (DN 41-4, PageID #: 180). Defendant Spurlock's report states that Plaintiff "grabbed the taser and refused to let go" and that the taser "had to be reactivated several times to gain compliance." (DN 41-20, PageID #: 267).

Defendants contend that the post-incident medical assessment documented normal vital signs and only minor abrasions consistent with taser contact, rather than injuries supporting Plaintiff's allegations of repeated punching, kicking, or unconsciousness. (DN 41-1, PageID #: 163; DN 44-1, PageID #: 317-18). Defendants also maintain that Plaintiff attributed blood on his paper boxers to hemorrhoids and that nursing documentation reflected that he reported bleeding before the entry team's involvement. (*Id.*). Defendants also point to documented injuries to Defendants and other officers as supporting their account of Plaintiff's resistance. (*Id.*).

Defendants argue that handheld and surveillance footage shows Plaintiff lunging toward Defendant Nielsen in the strip cage, grabbing and refusing to release Defendant Spurlock's taser, resisting placement in the chair, and biting Nielsen. (*Id.*, PageID #: 163–164). Defendants maintain that the recordings show no officer punching or kicking Plaintiff, that medical staff checked the chair straps and assessed him, and that he later appeared calm before being returned to his cell without incident. (DN 41-1, PageID #: 164–165). Defendants further contend that disciplinary proceedings resulted in findings of guilt for injuries to staff and taking property by force or threat of force. (*Id.*, PageID #: 165–166). Further the hearing records reflect a finding of guilt for injury to Defendant Nielsen, amended findings for physical action against Defendant Anderson and other officers, and an amended finding for taking property by force or threat of force

in Defendant Spurlock's proceeding. (DN 41-12, PageID #: 246; DN 41-14, PageID #: 252; DN 41-16, PageID #: 258; DN 41-18, PageID #: 264; DN 41-20, PageID #: 271). Defendants assert that Plaintiff offered little defense during those proceedings and did not claim that officers punched or kicked him. (DN 41-1, PageID #: 166). Defendants also rely on their discovery responses denying that Plaintiff was punched or kicked and describing his seizure of a taser and bite to Defendant Nielsen. (*Id.*, PageID #: 166–167). Defendant Spurlock provides that he is "not sure how many times his taser was deployed because at one point Plaintiff grabbed and grasped the taser," while denying that anyone kicked or punched Plaintiff. (DN 41-23, PageID #: 293). Defendant Nielsen denies that Plaintiff was kicked or punched and states that, when he reached to turn Plaintiff's head away, Plaintiff "lunged forward and bit Mr. Nielsen's right bicep." (DN 41-24, PageID #: 304). Defendant Anderson denies the assertion that she admitted to watching Defendant Nielsen and others kick and punch Plaintiff. (DN 41-22, PageID #: 284).

Defendants contend that OC spray and taser use served as a good-faith effort to control Plaintiff and protect inmate, staff, and institutional safety, rather than a malicious or sadistic effort to inflict harm. (DN 41-1, PageID #: 167–168). Defendants argue that Plaintiff's uncorroborated allegations are contradicted by institutional reports, recordings, and disciplinary findings, leaving no genuine dispute of material fact. (*Id.*, PageID #: 168). Alternatively, Defendants claim qualified immunity because their response to Plaintiff's active resistance and assaults did not violate the Eighth Amendment. (*Id.*, PageID #: 169). Defendants further argue that no identified precedent clearly prohibited OC spray or taser force against an inmate who actively resisted, attempted to seize a weapon, and assaulted staff. (*Id.*, PageID #: 169–170). Defendants maintain that a reasonable officer could have believed the force was lawful and necessary under those circumstances. (*Id.*, PageID #: 170).

### C. Plaintiff's Response

Plaintiff contends that all three Defendants participated in and supervised the excessive force and owed him a duty of protection because they held supervisory positions. (DN 55, PageID #: 401–402).

Regarding exhaustion, Plaintiff argues that the grievances were rejected under CPP 14.6 as nongrievable because they concerned disciplinary proceedings arising from the January 18, 2024, incident. (*Id.*, PageID #: 402). Plaintiff contends that the nongrievable classification barred administrative exhaustion regardless of whether his grievances were timely or included every allegation. (*Id.*, PageID #: 402–403). The rejection notices identify an "Adjustment Committee decision" as the reason the grievances were nongrievable, rather than marking the separate untimeliness ground. (DN 41-2, PageID #: 172; DN 41-3, PageID #: 176). Plaintiff maintains that no administrative remedy was available for his excessive-force claim and requests judgment in his favor on exhaustion. (DN 55, PageID #: 403).

Plaintiff argues that Defendants omit events beginning at approximately 1:20 p.m. and focus instead on the later use of force, although the earlier events explain why he was placed in the observation cell. (*Id.*, PageID #: 403–404). Plaintiff alleges that Defendant Anderson maliciously orchestrated those events in retaliation for a separate pending lawsuit against her. (*Id.*, PageID #: 404). Plaintiff maintains that he asked Holmes to contact mental-health staff because he believed he was experiencing side effects from a new psychiatric medication, and that he repeated the request when Anderson came to his cell. (*Id.*). Plaintiff alleges that Defendant Anderson then had him handcuffed and shackled, removed from his cell, strip searched by Holmes, dressed in a suicide smock, and placed in an observation cell. (*Id.*). Plaintiff denies telling either Defendant Anderson that he was suicidal. (*Id.*).

Plaintiff relies on Defendant Anderson's adjustment-hearing testimony acknowledging that she received a report of his request for mental-health assistance and forwarded it to mental-health staff. (DN 55, PageID #: 404–405; DN 55-1, PageID #: 414). In Plaintiff's submitted transcript, Defendant Anderson first answers, "No I do not," when asked whether she remembers his request, but then explains, "I was relayed that information and I relayed it over to mental health." (DN 55-1, PageID #: 414). The same transcript provides Defendant Anderson stating, "You told me you were suicidal, and that's why you were placed on watch," and Plaintiff responding, "I never told you that, I never told you that." (*Id.*, PageID #: 416). Defendant Anderson's attached discovery response likewise asserts that Plaintiff verbalized suicidal intent and that she contacted shift commander Charles Roberts, while stating that mental-health services were notified but she does not recall who notified them. (*Id.*, PageID #: 461). Plaintiff challenges Defendant Anderson's credibility because she identified a different officer as the source of that information and denied that Plaintiff personally requested assistance from her. (DN 55, PageID #: 405). Plaintiff contends that Defendant Anderson's allegedly false report of suicidality initiated the chain of events culminating in removal of the smock, an assault, repeated tasing, unconsciousness, and placement in the chair. (*Id.*). Plaintiff argues that Defendant Anderson's failure to deny his account of the earlier events constitutes an adoptive admission and that discrepancies between her hearing testimony and the account presented through counsel require resolution by a jury. (*Id.*, PageID #: 406).

Plaintiff asks the Court to consider the fixed-camera and handheld recordings together with the earlier events leading to his placement on watch. (*Id.*). Plaintiff denies concealing his hands in the smock and contends that the recordings do not substantiate Defendant Anderson's accusation. (*Id.*, PageID #: 407). Plaintiff argues that he posed no institutional threat in the

observation cell and that Defendants fabricated and escalated the situation rather than leaving him alone. (*Id.*). Plaintiff maintains that Defendants cannot create the circumstances giving rise to force and then rely on resulting disciplinary charges to establish that the force was justified. (*Id.*).

Plaintiff submits an annotated list of video timestamps and asserts that Defendant Anderson initially stated that the entry team was activated because he possessed a prohibited blanket, although no blanket was in the cell. (*Id.*, PageID #: 407–408). In those annotations, Plaintiff identifies periods in which he allegedly backed up, accepted restraints, and sat in a plastic chair without resistance before officers moved him to the strip cage. (DN 55-1, PageID #: 417). Plaintiff asserts that Defendant Nielsen initiated the assault in the cage and that officers attacked him on the ground while his wrists and legs remained restrained. (*Id.*, PageID #: 418). Plaintiff's annotations identify taser deployments by Defendant Spurlock at approximately 10:05 and 10:14 and state that Plaintiff continued pleading and screaming for help while on the ground. (*Id.*). At approximately 10:36, Plaintiff writes that he became unconscious and "just lay still on the ground." *Id.*, PageID #: 419). Plaintiff further identifies periods of asserted compliance or lack of resistance during the chair-restraint process, repeated tasing by Defendant Spurlock, and later medical staff observations of injuries to multiple parts of his body. (*Id.*, PageID #: 420–424).

Plaintiff also relies on adjustment-hearing transcripts and Defendants' discovery responses as evidence of factual disagreements requiring a jury. (DN 55, PageID #: 408). For instance, Plaintiff contends that the Spurlock transcript provides, "I do not know an approximate amount, no," concerning the number of taser uses, and, "I believe myself and Horn dry stunned you at the restraint chair." (DN 55-1, PageID #: 425). The transcript also provides Defendant Spurlock explaining that Plaintiff pulled away and attempted to headbutt Defendant Nielsen, that he delivered a drive stun to Plaintiff's lower back, and that Plaintiff then obtained a grip on the taser

after they went to the ground. (*Id.*, PageID #: 426). Defendant Spurlock acknowledges that Plaintiff's smock was removed before entry into the cage, answering, "Before you enter the strip cage, yes." (*Id.*). Further, Plaintiff provides that Defendant Spurlock answered "Yes" when asked whether he remembered Plaintiff saying he was not suicidal and Spurlock saying he would speak with Massey about the situation. (*Id.*, PageID #: 427).

The Defendant Nielsen transcript describes the entry team's purpose as responding to concealed hands and alleged misuse of the smock, including covering the door or food tray, which Plaintiff disputes by providing, "Yea, that never happened." (*Id.*, PageID #: 440). The transcript records Defendant Nielsen explaining that the strip cage was used for decontamination, but that Plaintiff "became combative and turned and tried to headbutt me." (*Id.*). Defendant Nielsen further states, "Every measure that I took was for safety and control[.]" (*Id.*, PageID #: 442–443).

The disciplinary hearing records also recount Plaintiff's contemporaneous allegations of assault: Defendant Nielsen's hearing record attributes to Plaintiff the statement that officers "started hitting me" after taking him into the cage and slamming him. (DN 41-12, PageID #: 246). Horne's hearing record recounts Plaintiff stating, "I was assaulted in the strip cage," explaining that fear of being killed in the chair caused his resistance, and stating, "if it did happen I was just defending myself," concerning the alleged seizure of Horne's taser. (DN 41-4, PageID #: 183). Spurlock's hearing record also recounts Plaintiff stating, "There were multiple tasers on me at the same time," and alleging that staff refused his requests to photograph his injuries. (DN 41-20, PageID #: 271).

Plaintiff requests judicial notice of other excessive-force litigation involving KSP and argues that his allegations reflect a longstanding pattern and unwritten institutional policy of excessive force. (DN 55, PageID #: 408–409). He points to discovery responses where Defendant

Anderson states that she previously deployed OC spray at another institution that "was determined to constitute excessive force," resulting in a demotion, although the inmate's resulting litigation was dismissed. (DN 55-1, PageID #: 462). Defendant Anderson also states that she "received a write-up for poor work performance as a result of the incident in question for which she was demoted from lieutenant to officer[.]" (*Id.*). Plaintiff contends that Defendants have not eliminated genuine disputes about whether they maliciously and sadistically used force based on fabricated events. (DN 55, PageID #: 409). Plaintiff opposes qualified immunity on the grounds that Anderson fabricated his purported suicidal statement and that the record, viewed in his favor, establishes a violation of his clearly established Eighth Amendment right to be free from excessive force. (*Id.*, PageID #: 409–410). Plaintiff requests denial of Defendants' motion and submission of the disputed facts to a jury. (*Id.*, PageID #: 410).

**IV.**

***A. Failure to Exhaust Administrative Remedies***

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court, interpreting § 1997e, has expressly stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). Failure to exhaust administrative remedies under the PLRA is an affirmative defense for which defendants bear the burden of proof. *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012). Accordingly, summary judgment may be granted "'only if defendants establish the absence of a 'genuine dispute as to any material fact' regarding non-exhaustion.'" *Id.* at 456 (quoting

*Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)). Because defendants also bear the burden of persuasion for this issue at trial, their "initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Id*. at 455-56 (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)). The burden of defendants asserting the affirmative defense of exhaustion is satisfied where the defendants produce an administrative policy that governs the filing of grievances and shows that the plaintiff failed to fully exhaust his administrative remedies pursuant to the policy. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

In order "to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules', rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones,* 549 U.S. at 218 (2007) (citation omitted) (quoting *Woodford*, 548 U.S. at 88). To exhaust a claim, a prisoner must proceed through all of the steps of a prison's administrative process, *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999), and failure to "properly" exhaust bars suit in federal court. *Woodford*, 548 U.S. at 93. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules." *Id*. at 90-91. But an inmate need only exhaust those remedies that are "available"; if an administrative remedy "is not capable of use to obtain relief," then the PLRA will not act as a barrier to suit. *Ross v. Blake*, 578 U.S. 632, 642 (2016).

Defendants maintain that Plaintiff failed to exhaust his administrative remedies because: (i) he filed his grievances outside of the five working day window set forth in CPP 14.6(II)(J)(1)(a)(2), and (ii) one of his grievances also did not comply with CPP

14.6(II)(J)(1)(a)(4), which provides that a "grievant shall include all aspects of the issue and identify all individuals in the . . . written grievance so that all problems concerning the issue or individuals may be dealt with[.]" Defendants are correct that the undisputed record reflects that Plaintiff filed his only two grievances on February 19, 2024, which is more than five working days from January 18, 2024. (DNs 41-2, 41-3). Further, Defendants are correct that Grievance No. 24-02-058-G does not identify any Defendants (or anyone else for that matter) with regard to the events described in the grievance. (DN 41-3).

However, it is important to note that both grievances were ultimately denied as being non-grieveable because they related to an Adjustment Committee decision and not for being untimely and/or failure to identify all of the parties at issue. (DNs 41-2, 41-3). Plaintiff argues that because his grievances were deemed non-grieveable, "it does not matter whether [Plaintiff] timely filed, or set forth the factual entirety of his claims . . . because they were barred from being grieved in the first instance." (DN 55, PageID #: 403). The record reflects that officers filed six inmate discipline reports alleging harm done to officers by Plaintiff based on the events detailed in this case. (DNs 41-4, 41-12, 41-14, 41-16, 41-18, 41-20). The disciplinary reports initiated the Adjustment Committee inquiry and were all filed between January 19, 2024, and January 21, 2024. (*Id.*). The reports also reflect that a hearing was held based on the allegations in the reports on February 14 and 15, 2024. (*Id.*). Lastly, Plaintiff initiated his appellate rights to all of them with appeals being received on February 26, 2024, and those appeals being denied on March 1, 2024. (*Id.*). Thus, it appears that Plaintiff filed the grievances after receiving an adverse decision at the initial hearings and during preparation of his appeals.

This Court has held as follows in a similar situation:

> Though Brock-Butler argues that he need not exhaust his administrative remedies because his complaint involves non-grievable "disciplinary procedures"[1] . . . the Court disagrees. Disciplinary proceedings are non-grievable because they have their own appellate process that inmates must follow. Accordingly, an issue is non-grievable under CPP § 14.6(II)(C)(4) only where it is the result of a formal disciplinary action.
>
> None of Brock's remaining federal claims fall within that category. For example, Brock says that the officers used excessive force, placed him in a restraint chair, and confined him in an unpleasant manner. Yet, Brock points to nothing in the record to show that those acts happened as a result of a formal disciplinary action against him. The same is true of Brock's retaliation claim. While Brock alleges that he suffered a variety of retaliatory acts for filing this and other lawsuits, none were formal disciplinary actions.
>
> Rather, it is fairer to say that, under CPP § 14.6(II)(B), each complained-of issue was grievable. Accordingly, CPP § 14.6(II)(J) required Brock to file a written grievance. Yet, Grievance Coordinator Daniel Smith has provided a sworn affidavit, attaching to it all grievances that Brock filed between February 1 and March 31, 2015. None of those grievances relate to the subject-matter of this action. Brock has not introduced any evidence to the contrary. There is no genuine dispute of material fact, then, that Brock has not exhausted all administrative remedies as 42 U.S.C. § 1997e(a) requires. Therefore, the Court will dismiss Brock's remaining federal claims without prejudice.

*Brock-Butler v. Parker*, No. 5:14-CV-000210-TBR, 2016 U.S. Dist. LEXIS 87244, at *9 (W.D. Ky. July 6, 2016) (internal citations and quotations omitted).

Similarly, in this instance, Plaintiff has not alleged that any of the claims of this lawsuit occurred as a result of the formal disciplinary action against him. Further, just as the plaintiff in *Brock-Butler*, Plaintiff could have timely filed his grievances pursuant to CPP § 14.6(II)(B), as his Eighth Amendment claim against Defendants would have been grieveable. Accordingly, because there is no material dispute that Plaintiff's grievances were untimely filed, Plaintiff has failed to exhaust his administrative remedies, and his suit is barred from adjudication in federal court. *Woodford*, 548 U.S. at 93.

---

[1] "Disciplinary procedures" and "Adjustment Committee decision[s]" are both specifically contemplated as non-grieveable pursuant to CPP § 14.6(II)(C)(4).

The Court is cognizant that granting summary judgment to Defendants based on Plaintiff's failure to complete the grievance process after being erroneously told that his claims were non-grieveable may appear harsh. However, the Court cannot excuse Plaintiff's failure to exhaust his administrative remedies on any type of equitable grounds, as the Supreme Court has rejected such a "special circumstances" exception to the exhaustion requirement. *See Ross*, 578 U.S. at 639 (holding that "the PLRA's text suggests no limits on an inmate's obligation to exhaust – irrespective of any 'special circumstances'").

Accordingly, the Court finds that Plaintiff failed to exhaust his administrative remedies. Thus, the Defendants are entitled to summary judgment. As failure to exhaust precludes review by a federal court, there is no reason to delve into the merits of Plaintiff's Eighth Amendment claim.

**V.**

For the reasons set forth above, **IT IS ORDERED** that Defendants' motion for summary judgment (DN 41) is **GRANTED**. The Court will enter a separate judgment consistent with this Memorandum Opinion and Order.

Date: October 14, 2026

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: Plaintiff, pro se
Counsel of record

4414.016